UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:04CV-580-H

TIM COSS     PLAINTIFF

V.

JAMES HUTCHENS and
CHARLES NEUMANN     DEFENDANTS

**MEMORANDUM OPINION**

The Plaintiff, Tim Coss ("Coss"), a resident of Minnesota, has filed suit against Charles Neumann ("Neumann") and James Hutchens ("Hutchens"), two residents of Kentucky, alleging fraudulent misrepresentation and a violation of the implied covenant of good faith and fair dealing under Kentucky law. Defendants have moved for summary judgment.

I.

This case arises from an unsuccessful effort to establish a debt collection agency call center in Louisville, Kentucky. Defendants, Hutchens and Neumann, are owners of a local commercial debt collection business. At all times relevant hereto, Defendants were also part owners of a now defunct consumer debt collection business known as Commercial Services Group Consumer Division, Inc. ("Consumer Division").[1]

In October of 2002, Providian Financial Corporation ("Providian") contacted Defendants for the purpose of determining Consumer Division's ability to establish a call center (hereinafter

---

[1] Consumer Division was administratively dissolved on November 9, 2004.

"CSG Call Center") that would employ up to 250 full-time collectors in Louisville. The proposed call center was a potentially lucrative business opportunity for Consumer Division and the company decided to pursue it.

To that end, Consumer Division sought to hire someone who could help manage the logistics of setting up the call center. Tom Waters ("Waters"), a co-owner of Consumer Division who has not been named as a party in this case, proposed Plaintiff Coss as a potential candidate. Coss had been a client of Waters's in the past and Waters believed that Coss could provide the expertise needed to bring the call center into reality. Waters forwarded Coss's resume to Hutchens and Neumann. At that time, Coss was employed by Conseco Finance in Minnesota.

On November 23, 2002, Coss traveled to Louisville for an informal face-to-face meeting with Waters, Hutchens, and Neumann. The meeting was a success. Hutchens and Neumann became convinced that Coss possessed the necessary expertise to establish, staff and operate the proposed call center.

On December 9, 2002, Hutchens sent an e-mail to Waters and Neumann with a subject line referencing "An 'Agreement in Principle' on the CSG Call Center (CSGCC)." The e-mail was a business proposal, detailing the roles that Coss, Hutchens, Neumann and Waters would play in the proposed call center and the salaries that they would earn. The proposal stated in relevant part that if Coss accepted the position, he would receive, among other things, a fixed salary for six months and a 15% equity interest in the CSG Call Center once it was up and running. The proposal further stated that within six months of the CSG Call Center's becoming staffed and operational, Consumer Division and its accrued value would be folded into the CSG Call Center. When that happened, Coss would be given a 15% share in the accrued value of

2

Consumer Division. The proposal stated that as of December 9, 2002 Consumer Division was "conservatively valued by the owners at $1,900,000 to $2,100,000." The proposal predicted that the company "will produce approximately $400,000 in profits in 2002. If managed, it will continue to produce profits at this level (or at a higher level) for the foreseeable future." Coss alleges that these statements related to the value and profitability of Consumer Division were material misrepresentations of fact.

In the e-mail, Hutchens told Waters and Neumann to "review [our offer] carefully. I want your input and approval before we present it to [Coss]." Neither Waters nor Neumann object to the terms of the offer. Accordingly, Hutchens told Waters to forward the e-mail to Coss, which he did. Coss received the e-mail on December 11, 2002. Without taking any action to verify the accuracy of the figures contained in the e-mail, Coss accepted the offer and started work on January 1, 2003.

As outlined in the proposal, one component of Coss's job was to streamline the business operations of Consumer Division so that its profitable sectors could be folded into the CSG Call Center. To that end, he began auditing the financial records of Consumer Division. He allegedly discovered that Consumer Division had been engaging in fraud and embezzlement. Specifically, he discovered that starting in June of 2002 Consumer Division had been under-reporting to its clients the amount of money that it had actually collected from debtors, in some cases retaining the entire amount collected without authorization from the client. He also discovered that Consumer Division had been billing debtors for additional funds even after they had paid off their entire debt and retaining the entire sum collected. Consumer Division kept two sets of financial records at the insistence of Hutchens. Allegedly, one set of the records was

to keep track of the illegally acquired funds.

Coss reported his findings of impropriety to Hutchens and Neumann. Then after twice renegotiating his contract, Coss resigned on March 14, 2003. The call center was never established. By July of 2003, Consumer Division had no remaining assets and the business was closed down.

Plaintiff filed this lawsuit in October, 2004. Discovery is not complete and Defendants have moved for summary judgment. In order to grant a motion for summary judgment, the Court must find that the pleadings, together with the depositions, interrogatories and affidavits, establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

II.

In Count I of the Complaint, Coss asserts that Hutchens and Neumann fraudulently misrepresented the current value and the future profitability of Consumer Division in the e-mail that he received on December 11, 2002. In order to establish a claim of misrepresentation under Kentucky law, a party must prove by clear and convincing evidence all of the following elements: (1) a material representation; (2) which is false; (3) known to be false or made recklessly, (3) made with inducement to be acted upon, (4) acted in reliance thereon, and (5) the cause of injury. *See United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999).

**A.**

First, Coss claims that the Defendants' valuation of Consumer Division on December 9,

4

2002 constitutes a fraudulent misrepresentation. On that date, Hutchens asserted that Consumer Division was "conservatively valued by the owners at $1,900,000 to $2,100,000." Coss contends that Defendants intentionally inflated their valuation in order to dupe him into accepting the offer. If proven, this allegation would constitute misrepresentation under Kentucky law. The problem is that Coss has not presented sufficient evidence to prove his allegation. More to the point, no reasonable jury could conclude that Hutchens's valuation of the company on December 9, 2002 was factually false based on the evidence presented. In short, Coss has presented no evidence to establish that the actual value of Consumer Division as of December of 2002 was less than $1.9 million.

The evidence that Coss has presented does not prove that Defendants made an affirmative misstatement of fact. First, he has presented evidence that between June and December of 2002 Consumer Division earned approximately $300,000 through fraud and embezzlement. What is missing here, though, is an explanation as to how the ill-gotten gains affect the accuracy of Defendants' asserted valuation of the company, if at all. It is true that Coss has presented evidence that Consumer Division had no value in July of 2003, at which time it stopped conducting business. But the value of Consumer Division in July of 2003 does not prove that the company had no value seven months prior to that date, when the communication in question occurred.

B.

Coss also claims that Defendants fraudulently misrepresented the future profitability of Consumer Division. In the e-mail agreement, Hutchens asserted that Consumer Division "will produce approximately $400,000 in profits in 2002. If managed, it will continue to produce

5

profits at this level (or at a higher level) for the foreseeable future." This representation was a merely prediction of future events, which is generally not actionable as fraud in Kentucky. *See Brooks v. Williams*, 268 S.W.2d 650, 652 (Ky. 1954) ("It is a general rule that fraud must relate to a present or pre-existing fact and cannot ordinarily be predicated on representations or statements that involve mere matters of futurity or things to be done or performed in the future."). The Court sees no reason to depart from the general rule in this case. Coss is a sophisticated business man with vast experience in the collections industry. Clearly, he understood that Defendants' profit estimates were uncertain projections about the future. He failed to review Defendants' records prior to accepting the position in order to verify their calculation, which he was clearly qualified to do.

Conceptually, however, the most difficult question is whether Hutchens and Neumann can be liable for failing to disclose the company's unlawful practices to Coss before he accepted the employment offer. Under Kentucky law, once a party chooses to make a representation, the party cannot keep secret information needed to make the representation accurate. *In re Sallee*, 286 F.3d 878, 896 (6th Cir. 2002) (interpreting Kentucky law). Although mere silence is not fraudulent absent a duty to disclose, *Hall v. Carter*, 324 S.W.2d 410, 412 (Ky. 1959), a duty to reveal may arise from a partial disclosure of information, or from particular circumstances such as where one party to a contract has superior knowledge and is relied upon to disclose that information. *Smith v. General Motors Corp.*, 979 S.W.2d 127, 129 (Ky. Ct. App. 1998).

In *In re Salley*, bankruptcy debtors sued a bank and its parent company, alleging that the bank fraudulently induced the debtors to purchase a failing business. The debtors contended that the bank concealed appraisals to induce the debtors to purchase a laundromat which had

previously been financed by the bank with insufficient security. The bank asserted that it was not required to reveal all of the appraisals. The Sixth Circuit held that although no fiduciary relationship existed between the bank and the debtors, the bank's disclosure of one appraisal created a duty to disclose other appraisals, which were substantially lower than the one disclosed. *In re Salley*, 286 F.3d at 897. The court reasoned that the undisclosed appraisals threatened the validity of the encouraging appraisal that was disclosed. Having shown the one appraisal, the bank could not avoid revealing the other appraisals without making its earlier representations fraudulent under Kentucky law. *Id.*

    In this case, Defendants made affirmative representations about the profitability and financial well-being of the company. Defendants had no obligation to make such representations; but once they did, they could not keep information secret that was needed to make the representation accurate. In this case, Defendants failed to disclose that approximately $300,000 of the profits that Consumer Division earned in 2002 were earned unlawfully. Based on the evidence presented thus far, there is no way to know whether those illegally acquired funds were taken into account in arriving at the $1.9 million value figure or $400,000 profit estimate. However, there is no doubt that disclosure of the company's unlawful practices would have raised serious questions as to the validity of both of those estimates. There is evidence that Defendants were aware of the company's illegal earnings at the time they made the representations at issue, that they intended for Coss to rely on them and that he did in fact rely on them. Therefore, Defendants could not avoid revealing their acts of fraud without making its representations fraudulent.

C.

Defendants argue that Coss has failed to prove that he suffered damages as a result of Defendants' alleged misrepresentations. Under Kentucky law, Coss may recover the difference between the value of the property as it was fraudulently represented and the value of the property had it been properly represented. *See Dempsey v. Marshall*, 344 S.W.2d 606, 607 (Ky. 1961). "In such cases, the measure is generally held to be the difference between the actual and represented value of the business or property." *Id.*; see also Restatement (Second) of Torts § 549 (1977). In this case, there is no evidence as to the precise numerical difference between the value of Consumer Division as it was actually represented and the value of Consumer Division had it been properly represented. However, "[i]n an action for fraud, it is not necessary to prove the amount of damages with certainty, but only to establish with certainty the existence of damages." See Rickert, 996 S.W.2d at 469. Here, Coss has presented sufficient evidence from which a reasonable jury could conclude that Consumer Division was worth less than Defendants represented it to be. Therefore, there is sufficient evidence of damages to survive summary judgment.

III.

Coss also claims that Defendants violated their duty of good faith and fair dealing by sending him the allegedly fraudulent e-mail message on December 11, 2002. Generally, every contract imposes an implied duty of good faith and fair dealing in its performance and enforcement. *Ranier v. Mt. Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991); see also Ky. Rev. Stat. § 355.1-203 (Uniform Commercial Code). In this case, Plaintiff's allegations of wrongdoing arise exclusively from the formation of his employment agreement, not from the

performance or enforcement of the agreement.  Therefore, Plaintiff's claim for breach of the implied covenant of good faith and fair dealing must be dismissed as a matter of law.

The Court will enter an order consistent with this Memorandum Opinion.

cc:     Counsel of Record